UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE SU, ACTING DIRECTOR OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21CV182 HEA |
| | ) | |
| LEVERING REGIONAL HEALTH CARE | ) | |
| CENTER, L.L.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Joint Motion for Summary Judgment, [Doc. No. 58]. Plaintiff opposes the motion and has filed a written opposition thereto. Defendants have replied to the opposition and on October 4, 2023,oral arguments were taken on the motion.  For the reasons set forth below, the Motion will be granted.

### Facts and Background

Plaintiff's Amended Complaint alleges Defendant Levering violated the Fair Labor Standards Act, 29 U.S.C. §201, *et seq*.("FLSA") by not compensating its employees for lunch breaks which were not taken but the time for which was automatically deducted from the employees' pay. Plaintiff claims that since

February 13, 2018, Defendants have willfully violated and are continuing to willfully violate the overtime provisions of sections 7(a) and 15(a)(2) of the FLSA, by automatically deducting meal periods from shifts worked by its employees regardless of whether the employees actually took the meal break, or attempted to take a meal break but were interrupted by work activities. Plaintiff further claims Defendants did not require the employees to clock out at the beginning or end of their meal periods. Instead, Defendants implemented a timekeeping system that automatically deducted meal periods from the employees' hours worked. The Amended Complaint also alleges that since February 13, 2018, Defendants, have willfully violated and are continuing to willfully violate the recordkeeping provisions of sections 11(c) and 15(a)(5) of the FLSA, in that they have failed to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other working conditions and practices of employment maintained by Defendants, as prescribed by the regulations (29 Code of Federal Regulations Part 516) promulgated pursuant to section 11(c) of the Act; specifically, by failing to make, keep or preserve accurate and complete records of hours worked by and rates of pay for employees.

The Court finds the following undisputed facts:

Levering operates a skilled nursing facility where employees provide direct care to the facility's residents on a 24-hour basis. At the facility, employees in

Levering's nursing department provide "direct care" to the facility's residents or patients. "Direct care" basically means care involving direct contact with the resident and may include assisting toileting or feeding a resident. The job classifications within the nursing department include licensed practice nurse ("LPN"), certified nursing assistant ("CNA") and CNA preceptor, certified medical technician ("CMT"), quality of life advocate ("QLA") and assistant quality of life advocate ("AQLA"), hall monitor, and residential care coordinator.

The nursing department generally follows a chain of command: CNAs, CMTs, and hall monitors report to the "charge nurse"; the charge nurse reports to a registered nurse; the registered nurse reports to an RCC; the RCC reports to the assistant director of nursing ("ADON"); the ADON reports to the director of nursing ("DON"); and the DON reports to the facility Administrator.

Levering facility Administrator Logsdon testified that she has a role in assigning breaks, but only if employees "let [her] know that there's a problem."

Levering did not require nursing department employees to clock in or clock out for lunch breaks, unless the employee left the facility grounds; in other words, if an employee remained onsite at the facility, the employee did not need to clock out and clock back in for lunch.

Levering had a practice of automatically subtracting 30-minute lunch breaks from employee's work shifts. Prior to 2018, employees who missed a lunch break

or who did not take a full lunch break had been instructed to complete a temporary time sheet, obtain his/her supervisor's signature on the temporary time sheet, and then turn the signed form into Payroll or Human Resources so that the employee may be paid for the missed or reduced lunch break. Some employees were unaware of the policy, even though Defendants communicated to employees during orientation and at in-service trainings.

The U.S. Department of Labor Wage and Hour Division opened an investigation of Levering under the FLSA in February 2020. Investigator Thomas was the assigned Wage Hour Investigator. The investigation covered the period from February 13, 2018 to February 12, 2020. Investigator Thomas' first contact with Levering about the investigation was on February 13, 2020, when she sent Levering a request for records.

Interview Statements relate to the employees' job titles, responsibilities, hours worked, timekeeping practices, practices with respect to lunch breaks, and other conditions of employment. Investigator Thomas interviewed eight nursing department employees onsite at the Levering facility on March 6, 2020. At the end of each statement, she would confirm with the employee the information that he or she relayed to her, and she would make any corrections at that time.

The eight nursing department employees interviewed onsite on March 6, 2020, stated, in part:

(1) Employe B-6 interview statement: " . . . I have worked over 40 hours in a work week. When I work over 40 hours I get paid time and half. When I worked as [redacted] I worked the 2nd floor. When we were well staffed, my lunch was interrupted once or twice a week . When we were not well staffed, it was interrupted probably every day. I would get maybe 10 minutes. I took my lunch by leaving to go get food and eating on the way here maybe twice a week. There is no break room to get a lunch in. They deduct lunches anyway so I didn't clock out when I left the building. . . . Since I have been [redacted] I have not had a problem with getting a lunch. . . ."

(2) Employee B-8 interview statement: " . . . I pass meds, take vitals, basic C.N.A. work, and help the nurse, basically everything the nurse does minus injections. . . . I work 60-70 hours a week. I am scheduled 48 hours a week and [redacted] night shift. . . On day shift, I get a lunch break 2 out of 5 shifts, it really just depends on how the day is going. They have the paperwork, to fill out when we don't get our lunch, but they frown upon us filling it out because they say we should have taken lunch. When [sic] do get a lunch I usually leave and pick up lunch for me and everyone else. If I work evenings I don't get lunch at all. I can't leave. We don't have a break room, we can go to the dining hall, but then all of the residents would interrupt us. I never get lunch on overnight shift. We have one nurse on night shift per floor so in order for a nurse to take a break, you have to take a nurse off the other floor so that would make it virtually impossible. Night shift drops to minimum staffing. The lunch issue is with the nursing staff, I hardly see nurses take breaks. Day shift get lunches more often than the rest of the shifts, but that is because the RCC (resident care coordinator) is on the floor and can relieve them when RCC isn't busy in meetings. . . . Other than missed lunches, the hours I am paid for are accurate, for the most part. . . ."

(3) Employee B-14 interview statement: " . . . I don't get lunches all the time. I get a lunch 2 days out of 7. When I work [redacted], and when I [redacted] I didn't get lunches at all, but they take 30 minutes when I clock in to my knowledge. Basically every job I work , except [redacted] doesn't get lunch . 101s are overnight 12 hour shifts and there is no one to relieve me. RCF shifts are 8 hour shifts, and they didn't have coverage to give lunches. Hall monitor shifts are 12 hour shifts and I ended up helping C.N.A.s who never get lunch breaks either. . . . Everyone on the nursing staff has a hard time getting a break. . . . I just found out [redacted] ago there was a paper to fill out to get paid for missed lunches and no one fills them out. I asked a C.N.A. on the floor where to get one and she had no idea who had

them so I didn't fill anything out. . . . I clock in when I get here and clock out when I leave. . .Other than missed lunches, the hours I am paid for are accurate, I hope. . .”

(4) Employee B-26 interview statement: “RCF is the unit where residents don't need a lot of help and can basically live on their own. I was an [redacted]. . . . I get a 30 minute lunch usually at [redacted]. I clock out and leave the building. I have to cut my lunch short by 15 minutes every other day to come back to help out. . . I get uninterrupted lunch breaks 75% of the time. I clock back in and go back to work. They only deduct the time I was clocked out for, not the whole 30 minutes. . .”

(5) Employee B-28 interview statement: “. . . I care for residents , make sure paperwork is done and completed, and take vitals. If the RCC (Charge Nurse) needs help, I help out. I make sure the floor stays running. I work 100 plus hours a week. . . I clock in when I get here and clock out when I leave. I get a lunch break every once in a blue moon. The last time I got a lunch was the [redacted] before that I don't remember. I was on [redacted] that day and I left the building. If I stay over till [redacted], I leave the building and [redacted]. I don't eat during the day. I use my lunchbreak to shave somebody or something like that. In a month I get 3- 4 30 minute breaks from the building to [redacted]. I get anxious when I am not on the floor. If I wanted a lunch break I would get it. Everyone knows I don't take a lunch break and I think I am paid for it, but I don't pay attention. I think I am the only person in this building who doesn't get a lunch . . .”

(6) Employee B-38 interview statement: “ . . . I care for residents, make sure paperwork is done, and take vitals. . . I clock in when I get here and clock out when I leave. If you work 3rd floor or second floor you can get a lunch, but if you work 1st floor you don't get a lunch. That is because there is only 1 aid, so no one is there to relieve you. You have to beg to get a break. You can fill out the paperwork that you didn't get a lunch, but they will still take it out of your paycheck . . . Sometimes I have to stay 2 hours after my shift because relief doesn't come in . . . If I work second and [redacted] floor I get a full 30 minute lunch break at [redacted] . . .”

(7) Employee B-42 Interview Statement: “. . . I pass meds, give treatments, charting, paperwork, I supervise 4-5 people at a time, and care for patients. . . I work overtime every work week . . . Nurses don't get lunch breaks but they get deducted from my paycheck anyway. Usually I am the only nurse

on the floor so I can't leave. Every time I get a lunch deducted I did not get a lunch. Nurses on night shift don't get a lunch at all. . . . Nurses are worse off than C.N.A.s when it comes to lunches because some C.N.A.s get lunches occasionally. . . I don't fill out the paperwork to get my lunches paid for because it wouldn't make a difference. I don't even know where those papers are any more. . . .[redacted] are all nurses and don't get lunches . . . Our floor is probably the busiest floor, so the nursing staff on 2nd floor is probably busiest and even less likely to get lunches. . . . Other than the missed lunches, the hours I am paid for are accurate. . ."

(8) Employee B-43 Interview Statement: " . . . I was on the 1st floor, day shift. I took lunch 4 times a week out of the 5. [redacted] told me to take my lunch. They would send someone to relieve me. . . . I work 40-45 hours per week. I get overtime for hours over 40. I clock in and out for lunch now, but I didn't before. If I have to come back early and pass cigarettes, I clock back in and work. This happens maybe once a week.

Investigator Thomas conducted more interviews of current and former Levering nursing department employees during the investigation, this time by telephone on various dates between March 27, 2020, and November 12, 2020. Seventeen of the additional interviews were taken while the employee was currently employed at the Levering facility. The following is a summary of those additional employee statements taken by telephone between March 2020 and November 2020:

(1) Employee B-4 Interview Statement: ". . . I have worked overtime but not every pay period, maybe half of the time. I clock in and out on the time clock . . . I usually get my lunch. It is a lot easier to get away now they made a break room on the second floor. I usually tell the other aids when to go to lunch. Nurses never get lunches. They may be able to sit down for a bit, but there is no way they get 30 minutes away from the floor. It just isn't possible. Prior to getting the breakroom, I didn't get a full lunch twice a week, now I actually get a lunch. I would say that some C.N.A.s aren't getting lunches sometimes, but it is nowhere near as hectic for aides as it is

for nurses. They can't leave the floor and we can. Nurses may go to the smoke room to get away for 5 minutes. That's about it. . .”

(2) Employee B-7 Interview Statement: “. . . An RCC is over LPNs on that shift. It is kind of a Mini-DON, Director of Nursing. . . I supervised all the nursing staff on my floor. There are three RCCs at a time. . . . I was scheduled 40 hours a week, but I always had to come in and work a shift with no extra pay if I couldn't find someone to cover a nursing shift. . . . The complaints about not getting lunches were from C.N.A.s. I made sure the nurses on the [redacted] got their lunches when I could. . . But here's the thing, if someone would have come to ask me to give them a lunch, I would have. I have never heard of there being paperwork to fill out for missing lunch. . . . As a [redacted], I sometimes don't get my lunch, but I don't complain about it. . .”

(3) Employee B-10 Interview Statement No. 1: “ . . . I clock in and out on the time clock. . . The paystubs are really hard to understand and to read. . . it is kind of suspicious they don't show you your rate of pay, how many hours you were paid for and then the total. . . In the past year I have not had an uninterrupted lunch break. I don't have anybody who can relieve me on the [redacted] floor. In order to get a lunch, I have to have a nurse or a med tech relieve me. There's no way to get a break if a nurse or a med tech doesn't relieve me. If I am able to leave the building that's the only time that I can get a lunch. No one comes to relieve me. There's a DON and ADON but they don't really relieve us for breaks. I can't remember the last 30 minute lunch that I actually had. Wait, yes I can. I had a 15 minute lunch break when the RCC relieved me for lunch. She had lunch with me but we eat on the floor while we were working. That was [redacted] and I guess that doesn't count as a lunch. 1 to 2 times a pay period I can get a 15 minute break. C.N.A.s also have to have someone cover for them. I'm on a unit with [redacted], but I can't get relieved to get lunch because I only have [redacted], I can relieve her if we are not too busy, but she doesn't get 30 minutes either. It's hard to relieve other units as well because you can't take from one unit to relieve another unit, then the other unit is going to be short. I don't fill out the paper to get my lunch reimbursed because they won't pay us for it anyway. . . People have complained about not getting lunch reimbursed when you fill out the paperwork, but she is the only one I know personally who actually got in trouble. . .”

8

(4) Employee B-10 Interview Statement No. 2: " . . . Prior to last week I hadn't worked [redacted] hours in a very long time. I came in at [redacted] and work till [redacted] and I had 2 lunches deducted. I didn't actually get them."

(5) Employee B-10 Interview Statement No. 3: ". . . I have not gotten a single lunch since I spoke to Wage and Hour last. They still auto deduct lunches, we still don't get them. I am willing to testify to that fact. I work [redacted] to [redacted] as a [redacted], I have not noticed any changes for the C.N.A.s I spoke to [redacted[, she is a C.N.A. on [redacted] and she said they barely get breaks, let alone 30 minute breaks. There has been no meeting to talk about lunches or a training of any kind. . ."

(6) Employee B-10 Interview Statement No. 4: "We all had to sign a form today that said we were trained on the clock in and out procedure. I knew they were going to try something shady. The whole form is a lie. The receptionist, Gina Abbey , who is the DON's sister, came around and basically said "sign this." . . . She gave it to everybody on [redacted]. We never did any training. . . I read most of it, but I felt so pressured to sign it right away, that I just went ahead and signed it, even though it wasn't true. They gave us the form while we were all on the clock. I felt like I had to sign it. The form says I agree that I have not missed any lunch hours. I felt like they would know that I was talking to DOL if I refused. . . Nothing changes. . . No one relieves anyone for lunch when I am around and I work [redacted] to [redacted]. . ."

(7) Employee B-19 Interview Statement: "I am an LPN . . . I am in charge of my floor... I usually work 40-60 hours a week . . . I work overtime almost every week. . . In the past [redacted] I have not gotten a lunch, ever. I can't get 20 minutes to chart without being interrupted at least 3 times, let alone 30 minutes to have a lunch. . . The C.N.A.s that work with me always get their lunches. The C.N.A.s that work with me rotate so I'd say for sure they get lunch once a week. As far as lunches go, they still auto deduct. We had a meeting a month ago and they said we have to take lunches. That was so pointless. I worked a 16 hour shift [redacted] when I clocked out it said [redacted]. They took two thirty minute lunches from me. I did not get a 15 minute break, let alone 2 thirty minute lunches. Nurses can't leave their floors, let alone leave the building. . . . There is a very high turnover at Levering especially in nursing. C.N.A.s, CMTs, and LPNs have a rotating door. They [sic] hours are so high, a lot of people can't take it. . ."

(8) Employee B-22 Interview Statement: "Nothing has changed for us since DOL has come in. We have not had any meetings or trainings. My lunches are auto deducted. In a week I don't get a single lunch, regardless of the hours I work in a day. . . In the past [redacted], I have not gotten a 30-minute uninterrupted lunch break. I am willing to testify to that fact because it is the truth. . ."

(9) Employee B-24 Interview Statement: ". . . I work 50-60 hours a week. . . I get lunch when I want to take it. If I want to take lunch, I will call the nurse. I don't know how often I don't get lunch, but when I do I know I get 30 minutes and that the time is uninterrupted. I think I can say that I always get my lunch. . . My lunches are automatically deducted so I don't have to clock out for lunch. . ."

(10) Employee B-27 Interview Statement: ". . . I usually work overtime. . . . In the [sic], I have not taken a lunch. I would be willing to swear to this. I am not able to leave the floor. The hours are greatly increased right now because of Covid19. No one can cover other people because we have so many people out sick or they have just quit. I work all shifts. The working conditions are the same on all shifts. I've never addressed missing lunches with management. I have never filled out the paperwork to get my lunches paid for. It would take me longer to get paid for lunch every day than the half hour I am docked every day. I am not sure if I am deducted for 2 lunches when I work a 16. C.N.A.s on my floor don't get lunch often, but they do get them maybe once a week. We just don't have enough staff. . . As far as lunches go, when hall monitors do one-on-ones, there is no way to give them lunches. But that is only half of their work. They get lunches more than C.N.A.s for sure. I bet they get lunches half the time. . ."

(11) Employee B-29 Interview Statement No. 1: ". . . I pass medication and charge the floor like a charge nurse. . . I clock in when I get here and clock out when I leave. . ."

(12) Employe B-29 Interview Statement No. 2: "As far as uninterrupted lunch goes I take lunch upstairs when I can. The problem is most the time I'm the only one on the floor. If I have to go into the dining room I can take 20 minutes at most. But usually I eat at my desk there's nowhere else to go. I don't know about everybody else, but on my floor the C.N.A.s get their breaks. They start relieving each other at [redacted], then they help out the

people that are on one-on-ones. The problem that you're going to have is that there's only so many people to cover for lunches. You got nursing, one-on-ones, C.N.A.s and hall monitors. The hall monitors are our non-certified people. I'm not sure if they do one-on-ones, but I think they do. The C.N.A.s do one-on-ones as well as regular C.N.A. work. C.N.A.s relieve everyone except for nurses and CMT's. Nurses can relieve CMTs but CMTs can't really relieve nurses."

(13) Employee B-32 Interview Statement: ". . . I clock in and clock out every day but I never get to take a lunch. I am willing to testify to the fact that I've never had a 30 minute uninterrupted lunch break. As far as the paperwork is concerned when I missed lunch I have never even heard there was such a thing. No one ever told me that I could even get paid for my lunches. . . The people who have a hard time getting lunches or [sic] anyone who is on the floor; that means nurses, QLAs, CNAs, hall monitors. No one, no one gets lunches. A few people might get breaks if they're very persistent and advocate for themselves. If they don't say anything they don't get lunches. No one shows up to relieve you magically like everybody says they should. We can't leave our halls unattended. Especially nurses, who is supposed to do [sic] relieve us to go to lunch if there has to be a nurse on every floor? . . ."

(14) Employee B-34 Interview Statement: ". . . I pass meds, do charting, take care of emergency medical situations, etc. It is required by law that every floor has a nurse on duty at all times. They work us to death. I work overtime a lot. . . I have not gotten lunch in [redacted]. Not one time, even as a [redacted]. As a [redacted], I cannot leave the floor, it is virtually impossible for me to get an uninterrupted lunch. I make sure my C.N.A.s get their lunches. Just because I am not getting a lunch doesn't mean they shouldn't. Plus, I need someone to get me food sometimes. . . As far as filling out the paper for getting lunch reimbursed, no one fills it out. They say we don't have any excuses for not taking a break and don't reimburse us anyways. ."

(15) Employee B-35 Interview Statement: ". . . I am scheduled [redacted] 12 hour shifts one week and [redacted] 12 hour shifts the next week. I always pick up shifts in addition to that . . . I am auto deducted 30 minutes each day for lunch, even though I do not get lunches and I am not able to leave the floor. I am not sure if they take an extra 30 minutes when we work 16 hour shifts, but I think they do. I probably have a 16 hour shift once a week. I

can't remember the last time I had an uninterrupted lunch. I am constantly interrupted. I work nights and it is just me on the floor, unless there is a code on another floor and I have to run to that floor. I take any breaks I can get in the nurses office. It is not possible to get a lunch as a nurse if the nurses can't leave. I think it would be more likely for a nurse on day shift to be able to leave since there is one med tech on the floor too during the day. But we are so understaffed, I am not sure. I work on the [redacted] floor. I try to make sure the C.N.A.s that work with me get lunches, but sometimes I know they don't always get lunch. . . C.N.A.s may not have someone to relieve them. Sometimes C.N.A.s have to do one-on-ones for hall monitors so they can go to the bathroom. But the C.N.A.s need someone to relieve them so they can relieve the hall monitors. We are so understaffed, it is really hard. . ."

(16) Employee B-40 Interview Statement: ". . . I'm in RCF Aid. . . The difference between an RCF Aid and a CNA is we don't have to change patients clothing, assist in toileting, shower, feed, or anything like that with our patients. . . I work 40 hours a week usually. I don't get a break but I'm not sure if I get paid for it or not. I'm so used to not getting a lunch that I eat when I can. . . I can eat in their rooms but I just can't leave. . ."

(17) Employee B-44 Interview Statement: ". . . As RCC, I am paid on a salary basis of [redacted] per year. An easy way to describe what I do is I am basically the Director of Nursing for my floor. I supervise the nurse, med tech, [redacted] C. N.A.s and the uncertified aids at one time. I don't really have a shift. I work around the clock. [redacted] If I am not here , I am sleeping . I am the nursing staff' s point of contact . I report directly to the DON. . . Previously I was paid [redacted] an hour. . . . We tried to get lunches, but I think I may have gotten a lunch, always less than 30 minutes, once a month at the absolute most, probably less than that. It was usually enough time to run and grab food at a drive through, then come back. Nurses have to be able to leave the building to not be interrupted during lunch. I have never gotten a full 30 minutes of uninterrupted lunch..."

Investigator Thomas conducted two more interviews of current nursing department employees by telephone on January 11, 2021, about one month before the Secretary filed suit against Defendants.

The following is a summary of the current employees interviewed on January 11,

2021:

> (1) Additional Employee Interview Statement at DOL 3249: ". . . I have not
> gotten a 30 minutes uninterrupted lunch break. They auto deduct a lunch
> after 4 and a half hours, I think."
>
> (2) Additional Interview Statement at DOL 3250-3251: "Since the last time I
> spoke to WHD, nothing major has changed. . . I work night shift now and we
> aren't allowed to leave. . . Sometimes on [redacted] floor I get my lunch,
> maybe half the time now. I try to advocate for myself since the person who
> schedules us doesn't make sure we get lunches. On the other floors, I don't
> get lunches unless the nurse lets me go, which is really hard and I don't get
> 30 minutes. I get a 30 minute lunch less than half the time all together, way
> less than half the time. But I am one of those people who complains and
> complains until I get my lunch. Most people never get any lunch. The nurses
> don't get lunch, ever. I have never seen a nurse take a lunch. . . We get in
> trouble for filling out the missed lunch slips. They yell at us that there is no
> excuse we didn't take our lunch, like we are stealing from them. They
> complain if anyone submits the papers. It's like they are punishing us for
> being so short staffed and working. . ."

Based on its investigation, U.S. Department of Labor Wage Hour Division,

("WHD") determined employees were not compensated when they missed lunch

breaks or when their lunch breaks were interrupted and WHD calculated overtime

back wages for the missed lunch breaks.

Investigator Thomas used the information she gathered during employee

interviews to determine the average number of hours nursing department

employees spent working during lunch breaks each pay period. For example,

Investigator Thomas interviewed 13 employees who described the working

conditions of CNAs. Eleven of the 13 employees reported that CNAs missed

or had interrupted lunch breaks. Using the information from interviews, Investigator Thomas determined that Levering nursing department CNAs were shorted an average of 3.19 hours in overtime pay periods due to missed or interrupted lunch breaks. To determine the amount of unpaid overtime compensation due, Investigator Thomas also relied on Levering's payroll records. During the investigation, Levering produced a document titled "Employee Earnings" that covered the Investigation Period. The Employee Earnings record showed each pay period when a nursing department employee was paid overtime. For each employee at issue, Investigator Thomas added the additional average hours worked according to the employee's job classification.

Using a list of employees and job classifications that Levering provided during the Investigation, Investigator Thomas identified the employees who worked in the relevant job classifications in the nursing department during the Investigation Period. Investigator Thomas made similar calculations using the same method for the other job classifications – LPNs, hall monitors, QLAs, RCCs, CMTs.

For each job classification, Investigator Thomas extrapolated the results to the larger group of employees who worked within the same job category. Investigator Thomas added the additional hours to the employee's hours worked, but only for workweeks in which the employee was paid overtime, for the period

from February 13, 2018 to February 12, 2020. For example, Investigator Thomas determined Kara Allen (who had worked as a QLA) was paid overtime on 33 payrolls between February 13, 2018 and February 11, 2020. Allen's regular rate of pay according to the Employee List was $14.50 per hour. Every pay period, Allen's job classification was found to have been shorted 5.83 hours of pay. Investigator Thomas determined that employee Allen was owed time-and-one half $14.50.

Prior to 2018, Levering implemented an automatic meal deduction policy, whereby it automatically deducted a 30-minute unpaid meal period from an employee's time if the employee worked a shift of more than six (6) hours. Levering had a process in place by which employees who missed a lunch break or who did not take a full lunch break were able to report their time worked in order to be compensated.

Prior to 2018, employees who missed a lunch break or who did not take a full lunch break were instructed to complete a temporary time sheet, obtain his/her supervisor's signature on the temporary time sheet, and then turn the signed form into Payroll or Human Resources so that the employee may be paid for the missed or reduced lunch break.

If an employee of Levering was not able to take his or her break, if he or she reported it to Levering, the employee would be compensated for the missed break.

Levering's administrator testified that Levering was not aware of any concerns where employees missed breaks and were not compensated. She further testified that Levering is unaware of any employee who was ever disciplined for not following the meal break policy.  She testified Levering was not aware of any complaints of employees missing or taking reduced breaks that were not reduced to a temporary time sheet.

The temporary time sheet used for purposes of reporting missed or interrupted breaks was in place prior to February 2018.

Investigator Thomas testified in deposition as the corporate representative of Plaintiff, Julie A. Su, Acting Secretary of Labor, United States Department of Labor. She served as the only Wage and Hour investigator assigned to investigate Levering. She admitted in her deposition that Levering's automatic meal deduction policy and policy for reporting time worked during a meal break is compliant with the FLSA. She determined, however, Levering violated the recordkeeping requirements of the FLSA because it did not keep accurate record of employees who missed lunch.

During the Department of Labor's investigation, Investigator Thomas interviewed more than forty (40) former and current employees of Levering. Not a single Levering employee interviewed by the Department of Labor identified a single day with a date that they worked through lunch, turned in a temporary

timesheet to be paid for working through lunch and were then not paid for that time. Investigator Thomas testified that multiple Levering employees stated that they never received a lunch break. She further testified that some Levering employees told her that there was a common belief that employees would not get paid if they completed temporary timesheet to be paid for working through lunch.

Plaintiff relies upon twenty-eight (28) Levering employee statements for claiming 138 employees are owed back wages. Investigator Thomas testified that when calculating the alleged average number of missed hours per pay period for LPNs, she did not just rely upon statements from LPNs, but rather individuals in other career fields (or job classifications) as well. Investigator Thomas testified that for purposes of determining the alleged average amount of time employees worked through lunch without being compensated, she treated witnesses who stated that their lunch was interrupted the same as individuals who stated they did not get a lunch break at all. She further testified that she did not ask the Levering employees she interviewed how long the interruptions to their lunch breaks were or how long the average interruptions were. Investigator Thomas testified that if an employee's lunch interruption was less than ten (10) minutes, the employee is still considered to have received a lunch break. She testified in deposition that there is no way to know who on the Appendix A had lunch interruptions of less than ten (10) minutes as compared to lunch interruptions of more than ten (10) minutes.

Investigator Thomas could not identify a single Levering employee who stated that he or she could not go back and finish the lunch break if the lunch break was interrupted.

Investigator Thomas testified in deposition that multiple Levering employees admitted to being aware of the policy for reporting time worked during a meal break but chose not to follow it.

Angela Logsdon, Administrator at Levering testified that prior to the Department of Labor's investigation in 2020, Levering was not aware of any complaints relating to its automatic meal deduction policy and process for getting compensated for time worked during a meal period.

Investigator Thomas admitted that she did not interview anyone who indicated he or she was personally reprimanded for filling out the paperwork indicating he or she had missed lunch. She testified that employees believed they would not get paid if they filled out the paperwork indicating they missed lunch. There are no circumstances in which an employee's completed temporary time sheets indicating they worked through a break that would not be approved.

There is no evidence in Investigator Thomas' investigation report from the employee statements  that any employee reported to her that he or she was personally discouraged by Levering. from filling out the paperwork to indicate he or she had missed lunch.

During her investigation, Investigator Thomas requested a number of documents, including Levering's payroll and timeclock records. Levering produced all payroll and timeclock records she requested for the relevant time period, with the exception of updated records. Investigator Thomas testified that the documents she was provided during the investigation included all of Levering's payroll register. During the investigation, Levering produced documentation showing its employees' regular pay, overtime pay, and shift pay.

None of the witness statements obtained by Investigator Thomas during her investigation identified a date on which an employee claims to have missed his or her break or had the break compromised by an interruption.

## Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.

The Eighth Circuit Court of Appeals has explained,

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)

(en banc)] (quotations omitted). A fact is "material" if it may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (quotations omitted).

*Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1047–48 (8th Cir. 2022). To put the "materiality" requirement slightly differently, " '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Rusness*, 31 F.4th at 614 (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.' " *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019).

The parties bear specific burdens on a motion for summary judgment. "The moving party bears the burden of showing the absence of a genuine dispute."

20

*Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). Thus, " '[t]he movant bears the initial responsibility of informing the district court of the basis for its motion and must identify those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting *Torgerson*, 643 F.3d at 1042).

The burden on the resisting party is as follows:

The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "A mere 'scintilla of evidence' is insufficient to defeat summary judgment, and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015), quoting *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010).

Similarly, if the movant has supported its motion for summary judgment, the party opposing summary judgment "may not simply rest on the hope of discrediting the movant's evidence at trial." *United States v. 3234 Washington Ave. N.*, 480 F.3d 841, 844 (8th Cir. 2007) ("*3234 Washington*"). Where the testimony of the movant's witnesses is critical, if the testimony is "positive, internally consistent, unequivocal, and in full accord with the documentary exhibits," "then the opposing party cannot force a trial merely to cross-examine the witness or in the hope that something might turn up at the trial." *Id*. at 845 (quotations omitted); *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016). But summary judgment is improper where specific facts "even partially" undermine the witness's credibility in a material way. *3234 Washington*, 480 F.3d at 845.

*Erickson*, 31 F.4th at 1048. Thus, " '[t]o show a genuine dispute of material fact, a party must provide more than conjecture and speculation. Rather the nonmovant has an affirmative burden to designate specific facts creating a triable controversy.'" *Rusness*, 31 F.4th at 614 (quoting *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### Discussion

The FLSA requires employers to pay non-exempt employees at a rate not less than one and one-half times an employee's regular rate for all hours worked more than 40 hours in a week. 29 U.S.C. § 207(a)(1). An employer must pay a non-exempt employee for hours worked that the employer has actual or constructive knowledge of. The constructive-knowledge rule requires an employer to use reasonable diligence to determine whether its employees are working more than their scheduled hours. *Hertz v. Woodbury Cnty, Iowa*, 566 F.3d 775, 781 (8th Cir. 2009). The FLSA requires employers to keep records of the number of hours worked each day and a total of the number of hours worked each week by each

employee. 29 U.S.C. § 211(c). However, access to records indicating that an employee was working overtime is not necessarily sufficient to establish that the employer had constructive knowledge. *Hertz*, 566 F.3d at 781-82. "The FLSA's standard for constructive knowledge in the overtime context is whether the [employer] should have known, not whether it could have known." *Id.* at 782.

If an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process. *Bell v. Westside Dialysis Unit, LLC,* No. 4:21-CV-00748-BRW, 2023 WL 2350598, at *2–5 (E.D. Ark. Jan. 23, 2023; *Cage v. Multiband, Inc.*, Case No. 1:12-cv-87 SNLJ, 2015 WL 687120, at 10 (E.D. Mo. Feb. 18, 2015); *Hussein v. Capital Bldg. Servs. Grp., Inc.*, 152 F. Supp. 3d 1182, 1192 (D. Minn. 2015). However, courts have found that an employer's formal policy for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting of overtime in practice. *Allen v. City of Chi.*, 865 F.3d 936, 939 (7th Cir. 2017).

Under the FLSA, the burden is on Plaintiff to prove the employees performed work for which they were not paid. "An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.' *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686–

87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), superseded by statute on other grounds."

*Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014).

   If Defendant's time records are inaccurate or inadequate, Plaintiff must

produce "sufficient evidence to show the amount and extent of that work as a

matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. Plaintiff can

satisfy this burden in different ways, including records and testimony. See

*Mumbower v. Callicott*, 526 F.2d 1183, 1186 (8th Cir. 1975).

   However, relying "mainly just [on] recollections of daily activities" does

not suffice—at least where those recollections are general and vague. *Holaway*,

771 F.3d at 1058.

   Plaintiff presents summaries of three employees who claimed they did not

know of Defendant's policy for reporting overtime work and the process for

getting paid.  Defendant has presented evidence that its policy was presented to its

employees during orientation and during training. While these employees may not

have known of the policy in spite of the orientation and training, there is no

evidence in the record that these three employees ever inquired about getting paid

for working overtime.

   Likewise, Plaintiff's argument regarding the statements of employees that "it

was frowned upon" if employees followed the policy, based on what these

employees had heard, falls squarely within the category of "general and vague,"

which is insufficient to overcome Defendant's evidence that a policy was in place. Plaintiff presents no evidence that employees submitted timesheets for missed lunch breaks and were not paid in accordance with the policy. Defendant is correct that Plaintiff cannot rely on statements made by employees relaying what they had heard from other employees. Under the Eighth Circuit's holding in *Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n,* 551 F.2d 1136 (8th Cir.1977), such statements are not admissions of a party opponent and constitute inadmissible hearsay within hearsay. *Carraway v. Christian Hosp. Ne./Nw.*, No. 4:03CV1077FRB, 2006 WL 2524203, at *4–5 (E.D. Mo. Aug. 30, 2006). Plaintiff's burden to meet proof with proof is greater than simply relying on statements from employees as to what they heard from other unknown employees.

Plaintiff has not established that Defendant had actual or constructive knowledge of any work. See *Rapp v. Network of Cmty. Options, Inc.*, 3 F.4th 1084, 1088 (8th Cir. 2021).

Defendants' policies required employees to submit their missed lunch breaks to receive payment for missed breaks. Plaintiff presents no evidence that forms were submitted, and there is no admissible evidence that Defendant told its employees not to request overtime. Plaintiff has failed to provide evidence from which a jury could rationally conclude that employees worked over forty hours a week and Defendant had knowledge of such to reasonably determine the amount

and the extent of overtime work as a matter of just and reasonable inference.
*Holaway*, 771 F.3d at 1060.

Plaintiff's reliance on employee statements is too vague, too general, and unsupported by reliable evidence. Defendant maintained a valid policy and procedure for requesting overtime pay for missed lunch breaks. Plaintiff has not presented any admissible evidence that the policy was not followed.

## Conclusion

Based upon the foregoing, Defendant is entitled to judgment as a matter of law. The record before the Court establishes Defendant has not violated the FLSA through failing to compensate its employees for overtime of which it was aware.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 58] is granted.

An appropriate judgment is entered this same date.

Dated this 13th day of October, 2023.



_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE